## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | | |
|---|---|---|---|
| JEFFREY SOUSA, | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| v. | | ) | Case No. 11-CV-2132 |
| | | ) | |
| KEITH ANGLIN, | | ) | |
| | | ) | |
| | Defendant. | ) | |

### ORDER

Pro se Plaintiff Jeffrey Sousa filed an Amended Complaint (#15) pursuant to 42 U.S.C. § 1983 against Defendant, Keith Anglin, Warden of Danville Correctional Center, on October 4, 2011, alleging that Defendant violated his rights under the Eighth Amendment to the United States Constitution. Plaintiff alleged that Defendant violated the Eighth Amendment by failing to protect him from a cellmate whom Defendant knew to be violent. Plaintiff filed a Motion for Summary Judgment (#83) on April 8, 2014, to which Defendant filed a Motion to Strike (#86) on April 21, 2014. Defendant filed a Motion for Summary Judgment (#87) on May 15, 2014. For the following reasons, Defendant's Motion to Strike (#86) is MOOT. Plaintiff's Motion for Summary Judgment (#83) is DENIED. Defendant's Motion for Summary Judgment (#87) is GRANTED in full.

Plaintiff filed his Second Amended Complaint (#15) in this case on October 4, 2011.[1]  In the complaint, against Defendant Anglin, Plaintiff alleged that Defendant denied his right to be free from cruel and unusual punishment under the Eighth Amendment when he:

> "allowed (2), two, emergency grievances to not be received by your, or, answered
> by you, concerning [Plaintiff's] being assaulted physically by inmate Frederick
> Tremain, who was the blood cousin of 'barn boss', Shawn Russell, another of
> your barn bosses, and [Plaintiff] suffering assault from Tremain, ***, Tremain
> also under your charge had either physically assaulted or terrorized no less than
> (5) five previous cellies before inmate [Plaintiff], those pleas going unanswered
> or unheard, and you as Warden denied [Plaintiff] ever sent grievances or that you
> ever received them, as [Plaintiff] has averred and sworn delivery of those
> grievances, to the contrary, which Plaintiff Sousa states as a violation of his U.S.
> Constitutional Rights, to wit, your conscious disregard for his health, safety, and
> pursuit of basic penal (institutional) happiness, to wit, to be a college graduate."

U.S. District Judge Michael P. McCuskey dismissed Plaintiff's claim against Defendant. On appeal, the Seventh Circuit reinstated the claim.  The court of appeals noted that, to state a claim for failure to protect, Plaintiff had to show (1) he was incarcerated under conditions posing a substantial risk of serious harm and (2) Defendant acted with a deliberate indifference to that

---

[1]Because Defendant Keith Anglin is the only defendant remaining in this case, this Opinion will not address the other defendants and allegations against those defendants.  For the complete extensive procedural history of this case, see the court's Opinion (#72) entered on February 10, 2014.

risk.  *Sousa v. Anglin*, 481 Fed.Appx. 265, 267 (7th Cir. Sept. 26, 2012).  First, the court of appeals found that the first element had been met, because Plaintiff alleged "he was housed with a 260-pound inmate who, because of his history of attacks on at least five prior cellmates and his status as a 'barn boss,' posed a significant risk of violence to the next person who shared his cell."  *Sousa*, 481 Fed.Appx. at 267.  The court also found that Plaintiff satisfied the second element, because he alleged that he "notified [Defendant] of the attacks when he submitted two emergency grievances describing the attacks and requesting a cell change, both of which were ignored.  These allegations are sufficient, at the pleading stage, to state a claim that Anglin, Waller, and Ward 'actually knew or consciously turned a blind eye toward an obvious risk.'"  *Sousa*, 481 Fed.Appx. at 268, *quoting Santiago v. Walls*, 599 F.3d 749, 758-59 (7th Cir. 2010).

*Deposition Testimony of Plaintiff*

Plaintiff testified that he arrived at Danville Correctional Center (DCC) because of good behavior at other facilities.  Upon arrival at DCC, he experienced chest pain and was hospitalized in the infirmary overnight due to his heart condition.  The next morning, upon release from the infirmary, he was told by Officer Waller that he had violated a security rule due to having matches in his possession.  Plaintiff denied having matches.  He appeared before the Adjustment Committee, which reviews inmate disciplinary matters, on the violation and was sentenced to five days in segregation and restricted privileges.

After coming out of segregation, Plaintiff was first housed with inmate Sean Russell.  Immediately before being placed in the cell with Russell, Plaintiff met with Officer Ward.  He had already filed a grievance against Officer Waller over the matches incident by the time of his meeting with Ward.  He met with Ward for ten minutes, and testified that Ward seemed receptive

to his concerns and ideas. Plaintiff stated that he saw a color coding come up next to his name on Ward's computer, but did not know specifically what the coding meant. When Plaintiff received his cell assignment, Russell was already in the cell in the bottom bunk. Plaintiff asked Russell to move his things so that Plaintiff could put his belongings on the top bunk. Russell was slow to move and Plaintiff testified that he and Russell did not see "eye to eye" from the beginning. Plaintiff thought that Russell was trying to "control" the cell. Plaintiff "felt" that Russell did not want a cellmate. After initiating the permit process, Plaintiff received a lower bunk permit, and Russell allowed Plaintiff to have the lower bunk, on the promise that Plaintiff would "look out for" Russell, which caused Plaintiff to be alarmed.

Plaintiff was housed with Russell from May 1 to June 12, 2008. From June 12 to June 18, 2008, Plaintiff and Russell were separated. They were moved to different cells on the same deck. Plaintiff was then housed with a Mr. White, whom he described as a "known homosexual." Plaintiff had his lower bunk permit and took the lower bunk, while White took the top bunk. On their first night in the cell together, White climbed onto Plaintiff's back. Plaintiff told White to get off him, and White complied. Plaintiff bunked with White for about two weeks, and believes it was done as punishment for his complaining to the guards about Russell. Plaintiff testified that he filed a grievance about being housed with White soon after being assigned to him. Plaintiff claims that Russell continued to harass him by having his "cronies" throw salt bags at him. Plaintiff did not have physical injuries from this harassment, but claimed to have mental anguish. Plaintiff claims to have told a Lieutenant Cunningham, during his time with White, about his harassment from Russell and complaints about White.

After being housed with White, Plaintiff was housed with several different cellmates.  He testified that he had a problem with each one, which should not have been the case because Danville was a reduced security institution, which led Plaintiff to believe that Officers Ward and Waller and Defendant were "out to get" him and that they "did it on purpose."  Plaintiff described encounters he had with Officer Waller, such as Waller threatening to write him up for having too many electronics, that he believes demonstrates Waller's bias against him.  Plaintiff believes Waller's treatment of him was a direct retaliation for a prior grievance Plaintiff filed against Waller.  Waller also wrote Plaintiff a ticket for smuggling potatoes out of the cafeteria when Plaintiff was recovering from dental surgery.  Plaintiff concedes that Waller was within his rights to write the ticket, but contends that Waller should have exercised his discretion to not write the ticket.

After a series of cellmates following White, Plaintiff was housed with Frederick Tremain.  Tremain was 6 foot two inches tall and weighed 220 to 250 pounds.  Plaintiff described Tremain as a "bulldog type face" and a "bruiser, cruiser, real mean looking guy."  Tremain was the cousin of Sean Russell.  Plaintiff was told Tremain would be his new cellmate.  Plaintiff was already in the cell when Tremain entered.  Plaintiff testified that the problems with Tremain began almost immediately.  Tremain entered and slammed his own property and legal boxes on the floor.  Tremain then stated to Plaintiff "I'm here."  That was the end of their communications on the first day.  Tremain took the top bunk and did not argue with Plaintiff about the matter.

Twelve to eighteen months had elapsed between the time Plaintiff was housed with Russell to when he was housed with Tremain.  Plaintiff lived with Tremain for six to eight weeks.  For the first three to four weeks in the cell, Tremain would "rant and rave", leading

Plaintiff to believe Tremain had psychological problems.  Plaintiff claims he went to Lieutenant

Cunningham's office to complain about Tremain a number of times, and that the lieutenant noted

it in his logbook.  Plaintiff claims he told the lieutenant that Tremain was a "problem" and asked

the lieutenant to remove him from the cell.  Plaintiff said he spoke to officers four to six times

before the first incident with Tremain.  Plaintiff would tell officers, including the "Zone

Lieutenant," that he was apprehensive about Tremain harming him "mentally" or getting into a

physical confrontation with Tremain.  He was apprehensive, not fearful.  Plaintiff had gotten into

prior fights with cellmates.

The first incident occurred three to four weeks after Tremain became Plaintiff's cellmate.

Tremain was listening to his cassette player while standing in the middle of the cell.  Plaintiff

was on the bottom bunk reading.  Tremain was having trouble with the player and growing

increasingly upset.  Tremain eventually threw the player with full force against the cement floor,

and the battery inside the player ricocheted off the back wall and came straight across the room

and hit Plaintiff below the eye.  Plaintiff was wearing his glasses at the time.  The battery was a

little AA battery.  When asked if it was intentional, Plaintiff testified:

"The laws of probability say it was an accident, but due to the entire cell

situation, just him igniting mentally and going off like that and throwing the

cassette player and not being considerate or concerned about me being there and

his actions, when that battery hit me it felt like a gunshot because he hit me right

in the cheek.  I thought I was actually hit by a bullet."

Plaintiff immediately jumped up and confronted Tremain, telling him he was hit in the

face by the battery.  Tremain acted like he did not notice.  Plaintiff said that he is "almost

positive that [Tremain] didn't mean to do it[.]" However, Plaintiff believes Tremain's anger and the deteriorating situation in the cell contributed to the incident. Plaintiff went to use the buzzer to summon the guards to the cell to complain, but Tremain blocked his path, causing them to bump shoulders. Tremain said that if Plaintiff alerted the guards, he would say Plaintiff assaulted him. To show he was serious, Tremain hit himself on the side of the head. Because Plaintiff's visible injury (red mark, bruising) healed quickly, Plaintiff never alerted the guards or medical staff to what happened. He treated himself. Plaintiff did not want to report the incident because it could turn into a "he said/she said" and both of them could have ended up going to segregation. Plaintiff was willing to spend more time in the cell with Tremain because he wanted to preserve his access to the college program and life in general population.

Plaintiff at first claimed the second incident occurred within two weeks of the battery incident, but on later questioning admitted it could have been just days after the battery incident. Tremain was punching and kicking the steel door, mad about something. Tremain came around to the side of the bed where Plaintiff was laying, and tried to engage Plaintiff in conversation. Plaintiff responded that he and Tremain really had nothing to talk about, which upset Tremain. Plaintiff referred to the battery incident. Tremain told Plaintiff he did not like his attitude. Plaintiff sat up and was struck hard by Tremain on the left side of his face. Tremain used his right fist. Plaintiff jumped up to fight and Tremain jumped back. Both went into fighting stances, before Tremain laughed, said "watch this" and began violently punching himself. Plaintiff sat back down and did not hit the buzzer. He waited for the cell door to open for the scheduled day room break. Plaintiff thought about saying something, but did not because he did not want to go to segregation and endanger his college courses.

After the second incident, Tremain made some more threats, but never assaulted Plaintiff again.  Plaintiff never saw any medical staff about the assault, because they would ask him what happened and he'd either have to lie or tell them the truth.  An officer asked him about the bruising, but Plaintiff told him it was acne.  Plaintiff has no idea who the officer was.  The bruise was initially the size of a silver dollar and stayed tender for about two weeks.  Tremain moved out of the cell within a week of the second altercation because he was "scared" of Plaintiff.  Tremain requested a transfer, but was refused.  When returned to the cell, Plaintiff confronted him and essentially told Tremain that, if it happened again, they would fight.  Tremain then left and spoke to the lieutenant.  Plaintiff was called into the lieutenant's office.

According to the OTS, the Offender Tracking System, Plaintiff and Tremain were housed together from August 9, 2010 to September 7, 2010.  Plaintiff claims Tremain took himself out of the cell on September 7, 2010.  Plaintiff claims that Tremain was in the cell for about a week after the second assault.

Plaintiff testified that Tremain became his "prey" after the second incident and that if he had "to do a murder in that joint, that's exactly what is going to happen."  If Tremain hit him again, Plaintiff would have "stuck him" "in the body" or "in the side of the skull and took half his head off literally."  Plaintiff received a new cellmate the day Tremain moved out.

Plaintiff filed two emergency grievances regarding the incidents with Tremain.  The first grievance was filed within 48 hours of the battery incident.  It was filed before the second assault.  In the grievance, Plaintiff complained specifically about Tremain and described the battery incident.  Upon further questioning about the content of his first grievance, after the battery incident, Plaintiff responded that:

"Just what I just stated to you was the basis of the grievance itself was that I had been having multiple problems with him in the cell and that I had gone to Lieutenant and asked for a cell change. I never got any response from the Lieutenant. My cell was not changed. I was still present with Tremain in his cell and he assaulted me with a battery that flew out of his cassette player."

He addressed the grievance to Defendant and deposited it in the mailbox. Plaintiff could not remember if he put the grievance in the mailbox or a specific grievance box. He did not remember if DCC had a specific grievance box, but if it did, he would have put it in the grievance box. However, when questioned, he stated that "[t]ruthfully, I believe I put it in the U.S. mailbox." Plaintiff received no response to the emergency grievance he mailed to Defendant. Plaintiff did not make a copy of the grievance. He had written a prior emergency grievance to Defendant, to which Defendant responded.

Plaintiff wrote the second grievance immediately after Tremain was removed from the cell. He marked it as an emergency grievance. In the second grievance, Plaintiff stated how upset he was that Defendant had not answered his first grievance, which was filed 8 to 9 days previously. He also included his concerns that Waller and Ward had instigated the situation by placing him with violent and troublesome cellmates. This grievance was also placed in the U.S. mailbox. There was no response to the second grievance as well, so Plaintiff wrote two more detailed notes to Defendant. He also placed these notes in the U.S. mailbox. He did not receive a response to the notes. Whenever he filed grievances through the normal channels, he received a response. Plaintiff never spoke to counselors or anyone else about the emergency grievances, because he wanted them to remain private.

On one of Plaintiff's prior emergency grievances, that had nothing to do with Tremain, Defendant demoted it from emergency to non-emergency. It took a couple of weeks or a month for Plaintiff to get a response.

Plaintiff believes Waller and Ward set in motion the series of events that led to him getting cellmates who wanted to intimidate or harass him. Plaintiff testified that he spoke to Defendant Anglin two times at the University of Illinois education justice project. Plaintiff did not, however, speak to Defendant about Tremain. He did tell Defendant, at one of the University of Illinois events, before he was housed with Tremain, about his troubles with Russell. After Tremain moved out, Tremain would continue to threaten and intimidate Plaintiff, such as when they were in the cafeteria.

In an incident report dated October 27, 2010, Plaintiff told a Lieutenant Burge that his former cellmate, Tremain, had been trying to intimidate him into fighting while they were in the cafeteria. The incident report also states that Plaintiff told Burge that, five weeks prior, while they were still housed together, Tremain assaulted Plaintiff by hitting Plaintiff in the face, but that Plaintiff did not report the assault because he did not want to go to segregation for fighting and risk getting kicked out of school. At the time, he and Tremain would only see each other a few times a week at meal time, as they were now housed in different wings. After reporting the incident, Plaintiff was taken to segregation. Tremain was also transported to segregation. The next morning Plaintiff was interviewed by an Officer Campbell and Plaintiff related his history of confrontations with Tremain. Plaintiff stated, during the interview, that he did not fear for his safety at DCC as long as he and Tremain were separated by cell house and that he should have no further issues or problems. Because he was placed in segregation, Plaintiff was kicked out of

school.  After being in segregation for a few weeks, he was transferred to a different prison in Dixon, Illinois.

When he arrived at Dixon, Plaintiff ran into some gang members who were members of the same gang as Russell and Tremain, and called Plaintiff a "snitch."  Russell and Tremain were cousins, according to Plaintiff.  The Dixon gang members threatened Plaintiff, but never physically attacked him.  Plaintiff stated in his deposition that Russell was a "barn boss," "an individual that is basically sponsored by the administration of the prison" who has "special privileges and favors" and takes "care of that dirty business or dirty laundry," like an "enforcer."  Plaintiff believes Tremain was acting on Russell's behalf.  Plaintiff never actually heard or saw a prison official say something to the effect that Russell was a barn boss or appointed to be a barn boss, but stated that "the word was kind of around through the inmate scuttlebutt."  Plaintiff believes Russell was barn boss on behalf of Defendant.  Plaintiff stated that he "was not afraid of Tremain.  I was afraid of what Tremain would do to my school program."

*Defendant's Deposition*

Defendant was promoted to warden at DCC in April 2008.  Defendant received 5 to 8 prisoner complaints a week.  Upon receiving the complaint, Defendant and his staff would read the complaint, see if the complaint was valid, then see how they could address or fix the complaint.  Defendant had responsibility for the housing conditions of inmates, such as making sure the units were livable and had heat and water.  He would review disciplinary reports of inmates.  All inmate discipline came through the Adjustment Committee.  Defendant's responsibility as warden for inmate safety was to make sure each inmate was safe and not being harmed or harassed by anyone.  If an inmate was in danger or threatened by another inmate,

Defendant referred the matter to the internal affairs department to investigate and see if the threats were valid. If the threats were valid, the inmate would be removed from the population and protected or, if need be, transferred out of the facility. Defendant defined an inmate assault when "an inmate was punched and didn't necessarily have a chance to defend himself[.]" If an inmate on inmate assault occurs, the officers go up the chain of command with the information until the lieutenant has it. The inmates are then placed in segregation and the internal affairs department begins an investigation.

Regarding the education program, if an inmate was involved in a fight in any way, he would be pulled from the program. The cell assignment committee oversees living arrangements in the housing units. The warden does not get involved in who is assigned to bunk with who. He would look at the housing information if there has been an incident in a cell or wing, or there is a specific security threat, such as gang issues. Offense history, sexual orientation, age, physical fitness, and race are not considered as factors in assigning cellmates. Gang membership can be a factor in assigning cellmates. Prior altercations are taken into account as well.

Automatic transfer of an inmate can be warranted by accusations of stealing, confrontations that could lead to an altercation, or other matters. The cell house lieutenant looks into the matter and authorizes the transfer. Defendant reads emergency grievances and determines if they are emergencies or not and after that the grievance is sent to the grievance officer. The grievance officer researches the grievance and decides if it has merit. Defendant does not formally document the grievance. The grievance officer keeps grievance records.

The grievance process can take anywhere from a day to a week. It can take longer on inmate safety issues to get all the information. The majority of grievances are termed

"emergency grievances" by inmates.  Defendant would consider a physical threat to inmate safety to be an emergency grievance.  Defendant was not aware of DCC ever losing an emergency grievance.  Grievances are treated the same when received, but if the warden determines a grievance to be a true emergency grievance, that grievance is moved to the front of the line.

Defendant was not familiar with Plaintiff.  It is possible he could have interacted with him, but he could not recall doing so and he could not describe Plaintiff's physical appearance.  Defendant did not know if Plaintiff had a reputation among inmates or correctional officers at DCC.  He never had to discipline Plaintiff and was not aware of any grievance Plaintiff filed against him.  Defendant believes there is a high likelihood that he would have looked at the incident report filed by Lieutenant Burge regarding Plaintiff telling him of his altercation with Tremain.  Defendant's secretary, who has signature authority, would have signed off on the report and referred it to internal affairs for investigation.

Defendant does not recall ever receiving an emergency grievance or note from Plaintiff.  Defendant was not familiar with Frederick Tremain or Tremain's reputation.  He also did not know Sean Russell.  Defendant had never heard the term "barn boss" and did not know what a barn boss was.  Defendant denied that DCC had barn bosses.  The prison staff will sometimes use inmates to gather information on other inmates, but they never use inmates to punish other inmates.  Defendant never personally assigned Plaintiff or Tremain to specific cells.

*Procedural Matters*

Upon return to this court by the Seventh Circuit, Plaintiff was appointed counsel from the University of Illinois College of Law Federal Civil Rights Clinic.  On November 1, 2013,

Defendant filed his Motion for Summary Judgment (#58). In the motion, Defendant argued that Plaintiff failed to exhaust his administrative remedies regarding Defendant's supposed deliberate indifference to the threat posed to him by Tremain. Specifically, Defendant argued that Plaintiff either: (1) failed to actually file the emergency grievances related to Tremain's assaults; or (2) intentionally spoliated evidence of the emergency grievances when he destroyed his copies of the grievances while housed at Dixon. Pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), this court entered an Opinion (#72) on February 10, 2014, that denied the motion for summary judgment and set the matter for an evidentiary hearing to determine the factual matter of whether Plaintiff actually filed the grievances and thus whether he had exhausted his administrative remedies. On March 5, 2014, Defendant motioned to withdraw exhaustion of remedies as an affirmative defense, necessitating the cancellation of the *Pavey* hearing. On March 6, 2014, the court granted the motion to withdraw affirmative defense of exhaustion.

At the same time, Plaintiff was having difficulties with defense counsel and his own counsel. According to Defendant's Combined Motion to Compel and Motion for Sanctions (#77), on March 3, 2014, Defendants attempted to take Plaintiff's deposition at the Brookens Administration Center in Urbana, Illinois. Approximately four hours into his deposition, Plaintiff claimed he needed to go to the hospital and accused defense counsel of threatening him. Plaintiff then conferred with his counsel for an extended period of time. Ultimately, Plaintiff left the premises without completing the deposition. The deposition was suspended. In his Response, Plaintiff stated he left the deposition early due to "legal threats" from defense counsel. Plaintiff also accuses defense counsel of making him "ill" by asking Plaintiff certain questions multiple times. Further, Plaintiff's counsel filed a Motion to Withdraw as Counsel (#79), citing

an irretrievable breakdown in the attorney-client relationship and noting that Plaintiff indicated to them twice that he no longer wished for them to serve as counsel and was refusing to speak to them.

Plaintiff did not object to his counsels' motion to withdraw and elected to proceed pro se. The court granted Plaintiff's counsels' motion to withdraw. The court denied Defendant's motion for sanctions, but granted the motion to compel. The court wrote:

"Plaintiff is warned that if he again impedes or delays the successful completion of the deposition, his case will be dismissed with prejudice. Here, Plaintiff was a deponent who failed to answer questions under Federal Rule of Civil Procedure 30, and this court is now compelling Plaintiff under Federal Rule of Civil Procedure 37(a)(3)(B)(i) to answer the questions and complete the deposition. See *Redwood v. Dobson*, 476 F.3d 462 (7th Cir. 2007) (a witness should not stay silent and refuse to answer a question he feels is improper during a deposition, but rather, if he objects, should state the objection concisely and in a non-argumentative manner; a witness may only refuse to answer when necessary to preserve a privilege, enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)). If Plaintiff fails to comply with this discovery order, this court can dismiss Plaintiff's cause pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(v). Therefore, it is in Plaintiff's best interests to complete his deposition without further incident. Plaintiff is therefore ordered, pursuant to Rule 37(a)(3)(B)(i), to complete the deposition peacefully and without incident at

the Office of the Attorney General in Springfield, Illinois."  Opinion, Docket Entry

(#81), entered March 7, 2014, *Sousa v. Anglin*, 11-CV-2132.

Plaintiff's deposition was then completed without incident.  Plaintiff has filed a Motion

for Summary Judgment (#83), to which Defendant filed a Motion to Strike (#86). Defendant

filed a Motion for Summary Judgment (#87).  The parties' motions are now fully briefed and

ready to be ruled upon by the court.

ANALYSIS

Defendant, in his motion for summary judgment, argues that he was not deliberately

indifferent to a substantial risk of serious harm to Plaintiff because: (1) Defendant lacked

sufficient personal involvement to support liability under § 1983; (2) Defendant did not act with

deliberate indifference; and (3) no evidence exists in the record supporting Plaintiff's claim that

Defendant intentionally assigned Plaintiff to a cell with Tremain for the purpose of causing

harm.  Defendant also argues that he is entitled to qualified immunity.  Plaintiff responds that

evidence in the record does demonstrate Defendant was personally involved in assigning him to

a cell with Tremain and that Tremain posed a grave risk of serious harm and that Defendant was

deliberately indifferent to that risk.  Plaintiff also argues that Defendant is not entitled to

qualified immunity.  In his own motion for summary judgment, Plaintiff presents a short

summary of his argument and simply states that his civil rights have been violated by

Defendant's "inactivity" and that Defendant neglected "the plaintiff's right to be protected,

under color of law."  Defendant responds, in the motion to strike, that Plaintiff's motion should

be stricken because (1) it fails to cite any evidence; (2) fails to present any evidence supporting

his claims; and (3) fails to present any legal arguments, all in violation of Federal Rule of Civil Procedure 56(a).

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. *See Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."

*Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson*

*v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Specifically, to survive summary

judgment, the nonmoving party "must make a sufficient showing of evidence for each essential

element of its case on which it bears the burden at trial."  *Kampmier v. Emeritus Corp.*, 472 F.3d

930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

*Whether Defendant Failed to Protect Plaintiff*

Defendant argues that he lacked sufficient personal involvement in Plaintiff's

constitutional deprivation to prevail, and that here, there is no evidence that Defendant: (1) knew

or caused Plaintiff and Tremain to be placed in the same cell; and (2) received, read, and was

aware of the alleged single emergency grievance Plaintiff filed prior to Tremain being moved to

another cell one week later.  Further, Defendant argues Plaintiff cannot satisfy both the objective

and subjective elements of deliberate indifference.  Defendant argues that he is entitled to

qualified immunity.

"Governmental actors performing discretionary functions are entitled to qualified

immunity from suits for damages 'insofar as their conduct does not violate clearly established

constitutional or statutory rights of which a reasonable person would have known.'" *Abbott v.*

*Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013), *quoting Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982).  "'Qualified immunity balances two important interests- the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officers from

harassment, distraction, and liability when they perform their duties reasonably." *Abbott*, 705

F.3d at 713, quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity

protects all but the plainly incompetent, and if officers of reasonable competence could disagree

on the issue of whether or not the act in question was constitutional, immunity should be recognized. *Gruenberg v. Gempeler*, 697 F.3d 573, 578 (7th Cir. 2012). "To overcome the defendant's invocation of qualified immunity, the plaintiff must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott*, 705 F.3d at 713. Once the qualified immunity defense is raised, the burden is on the plaintiff to defeat the defense and show that he had clearly established rights that the defendant violated. *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012).

The court will first address whether Defendant violated Plaintiff's constitutional rights. Plaintiff argues, specifically, that Defendant violated his rights under the Eighth Amendment pursuant to § 1983 when he was deliberately indifferent to a serious risk of harm to Plaintiff by ignoring Plaintiff's emergency grievances concerning the physical threat posed to Plaintiff by Frederick Tremain. In order to state claim under § 1983 against a prison official for failure to protect, a plaintiff must establish: (1) that he was incarcerated under conditions posing a substantial risk of serious harm; and (2) that the defendants acted with deliberate indifference to the plaintiff's health or safety. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010), *citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Because § 1983 does not allow actions against individuals merely for their supervisory role of others, individual liability under § 1983 can only be based on a finding that the defendant caused the deprivation at issue. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). In addition to the deliberate indifference element, § 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim and, although direct participation is not necessary, there

must be at least a showing that the defendant acquiesced in some demonstrable way in the alleged constitutional violation. *Palmer*, 327 F.3d at 594. Thus, to prevail on his claim, Plaintiff must establish that Defendant actually knew that Tremain posed a substantial risk of serious harm to Plaintiff and that his action, or inaction, was deliberately indifferent to Plaintiff's health or safety. *See Palmer*, 327 F.3d at 594.

"The first prong of a failure to protect claim– considered the objective prong- requires a plaintiff to allege that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005), *quoting Farmer*, 511 U.S. at 834. In order to satisfy the objective prong, a plaintiff must allege not only that they experienced, or were exposed to, a serious harm, but also that there was a substantial risk beforehand that the serious harm might actually occur. *Brown*, 398 F.3d at 910. The U.S. Supreme Court "has made clear that 'the deprivation alleged must be objectively, sufficiently serious,' amounting to a 'denial of the minimal civilized measure of life's necessities[]'" and that the question under the Eighth Amendment is whether custodial officials exposed a detainee "to a sufficiently substantial 'risk of *serious damage to his future health*.'" *Brown*, 398 F.3d at 910, *quoting Farmer*, 511 U.S. at 834, 843 (emphasis in original). Under this standard, a beating suffered at the hands of a fellow inmate clearly constitutes serious harm, "as '[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.''" *Brown*, 398 F.3d at 910-11, *quoting Farmer*, 511 U.S. at 834, *quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

The second prong of a failure to protect claim- considered the subjective prong- requires a plaintiff to establish his custodians' deliberate indifference to that substantial risk of serious

harm. *Brown*, 398 F.3d at 913. "[A] a prison official cannot be found liable under the Eighth Amendment *** unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 838.

First, the court will look at Plaintiff's assertions that Tremain was "known" to be violent before he was even placed in the cell, therefore putting him at immediate risk of substantial harm. "When our cases speak of a 'substantial risk' that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to detainees with known 'propensities' of violence toward a particular individual or class of individuals; to 'highly probable attacks'; and to particular detainees who pose a 'heightened risk of assault to the plaintiff.'" *Brown*, 398 F.3d at 911. These are "'risks so great that they are almost certain to materialize if nothing is done,' and thus are themselves sufficient to establish a 'substantial risk.'" *Brown*, 398 F.3d at 911.

Here, Plaintiff has provided no evidence that Tremain's known "propensity" towards violence posed such a substantial risk. To be certain, in reversing Judge McCuskey's dismissal of Plaintiff's claim against Defendant, the Seventh Circuit stated that Plaintiff met the objective prong because he "allege[d] that he was housed with a 260-pound inmate who, because of his history of attacks on at least five prior cellmates and his status as a 'barn boss,' posed a significant risk of violence to the next person who shared his cell." *Sousa*, 481 Fed.Appx. at 267. Such unsupported allegations are sufficient for Plaintiff to survive dismissal at the pleading stage, however, to survive summary judgment, Plaintiff may not rely on the allegations

contained in the pleadings. *See Waldridge*, 24 F.3d at 920. Rather, Plaintiff must present definite, competent evidence in rebuttal to Defendant's motion. *See Butts*, 387 F.3d at 924. Plaintiff has not done that. During his deposition testimony, Plaintiff admitted that it was Russell, and not Tremain, that he alleged to be Defendant's "barn boss." Besides his own assertions in his pleading, Plaintiff has submitted no evidence of Tremain's violent tendencies (before the incidents involving Plaintiff) or that Defendant had any awareness whatsoever of Tremain's tendencies before the alleged incidents with Plaintiff, and thus this aspect of Plaintiff's claim cannot survive the objective prong and cannot survive summary judgment. *See Whaley v. Erickson*, 339 Fed.Appx. 619, 622 (7th Cir. July 15, 2009).

Next, the court must determine whether Plaintiff has demonstrated that Defendant's failure to respond immediately to his emergency grievances after the incidents with Tremain represented deliberate indifference to that substantial risk of serious harm. The Seventh Circuit found that Plaintiff's pleadings satisfied the second, subjective element of deliberate indifference, where Plaintiff stated that "he notified [Defendant] of the attacks when he submitted two emergency grievances describing the attacks and requesting a cell change, both of which were ignored. These allegations are sufficient, at the pleading stage, to state a claim that [Defendant][][] 'actually knew or consciously turned a blind eye toward an obvious risk.'" *Sousa*, 481 Fed.Appx. at 268, *quoting Santiago*, 599 F.3d at 758-59. At that point in the litigation, the Seventh Circuit was basing its interpretation of the case off of Plaintiff's Second Amended Complaint, which did indeed allege that Defendant "allowed (2), two, emergency grievances to not be received by you, or answered by you, concerning [Plaintiff]'s being assaulted physically by inmate Frederick Tremain***"

However, the record has now been developed beyond the mere pleading allegations available to the Seventh Circuit in September 2012, and Plaintiff's deposition testimony has subsequently revealed that Plaintiff did not file the second grievance, which was based on Tremain's unprovoked striking of Plaintiff's face, until *after* Tremain had been removed from the cell.  After Tremain was removed, Plaintiff's only interaction with Tremain was in the cafeteria chow line.  Plaintiff was never again physically assaulted by Tremain.  In fact, Plaintiff stated during his deposition that after the second incident, Tremain became his "prey" and Tremain was *afraid* of Plaintiff, and that if Plaintiff had to murder Tremain, he would.   Thus, the second grievance cannot form part of a failure to protect claim against Defendant.  Therefore, the court will limit its analysis to the first grievance.  The question on summary judgment is whether Defendant's failure to respond to the first grievance, concerning the battery incident, constituted deliberate indifference to substantial risk of serious harm to Plaintiff's safety.

The court finds instructive the Seventh Circuit's decision in *Owens v. Hinsley*, 635 F.3d 950 (7th Cir. 2011).  In that case, the prisoner plaintiff was assigned to a cell with inmate Gordon.  For a month the two got along, but then without warning or explanation Gordon hit the plaintiff in the mouth, splitting his lip.  Gordon also threatened to hit him again.  The plaintiff reported the punch to the guards on duty, but at summary judgment he never said whether he also disclosed Gordon's threat.  The two guards remained silent when the plaintiff asked to be released from his cell.  Later that afternoon, when a different guard was in view, Gordon swung again, but the plaintiff avoided the punches and was immediately removed and taken to the infirmary by another guard.  The plaintiff was next housed with inmate Autin and, again, things were fine for a month, but then Autin ran out of medication to control his mental illness and

informed the plaintiff that he might want to move elsewhere in case he (Autin) lost control. The plaintiff told no one about the warning. A few days later Autin swung at the plaintiff, but missed. The plaintiff told a guard about the incident, and Autin chimed in that he would go after the plaintiff again. The plaintiff asked to be moved, but the guard said he could not do anything that day. Hours later the plaintiff was conversing with another guard about moving when Autin rushed from behind and shoved the plaintiff into the cell door bars. The plaintiff was taken to the infirmary. The district court granted summary judgment[2] for the defendant guards.

The Seventh Circuit affirmed, writing:

"On the evidence presented at summary judgment, a jury could not reasonably find that the guards, by declining to move [the plaintiff] to another cell, deliberately ignored a substantial risk that he would suffer serious harm at the hands of his cellmates. [citations omitted] Gordon's one surprise punch and Autin's wild swings did not give the defendants reason to believe that [the plaintiff] faced an imminent and substantial threat to his safety. The litigants did not submit testimony from [the defendant guards] and so the record does not reveal whether they reported the initial scraps to their superiors or took other reasonable steps to prevent a repetition. It does not matter. Even if the three

_____

[2]It should also be noted that, unlike most cases dealing with whether a prisoner plaintiff has satisfied the failure-to-protect standard, *Owens*, like the instant case, involves the summary judgment stage of proceedings, as opposed to the far more lenient pleadings stage. The summary judgment stage is the "put up or shut up" moment in the lawsuit, where the plaintiff must show what evidence he has that would convince a trier of fact to accept his version of events. *Koszola*, 385 F.3d at 1111. Conversely, at the pleading stage, the court takes all the plaintiff's factual *allegations* (as opposed to actual evidence) as true, draws all reasonable inferences in the plaintiff's favor, "and will hypothesize any set of facts consistent with those allegations to avoid dismissal." *Brown*, 398 F.3d at 912.

defendants shrugged off the minor fisticuffs, the evidence at summary judgment
shows only that they misjudged the rifts between [the plaintiff] and the cellmates
he bunked with amicably for a month. [The plaintiff] offered no evidence that he
told [the defendant guards] about Gordon's threat to strike again, and [defendant
guard Smith] had no reason to suspect Autin, who had not managed to land a
punch, was a serious threat to [the plaintiff].  Nothing indicates that the risk either
time to [the plaintiff] was more than minimal [citation omitted], and when another
scuffle signaled that tension remained, prison staff quickly stepped in and
separated the inmates.  Summary judgment for the guards was appropriate."
*Owens*, 635 F.3d at 954.

The facts of this case, as ascertained in the deposition testimony of Plaintiff, are less
egregious than those that confronted the *Owens* court.  As noted above, there is no evidence that
Defendant was aware of any threat to Plaintiff's safety from Tremain before the filing of the
emergency grievances.  There is also no evidence in the record, outside of Plaintiff's statements
that he did file the emergency grievances, that Defendant ever saw the grievances in question.
However, even assuming *arguendo*, that Defendant received Plaintiff's first emergency
grievance and did not respond, Defendant's actions do not amount to deliberate indifference to a
substantial risk of serious harm.  In *Owens*, the plaintiff was physically, intentionally struck by
his cellmate Gordon and was physically, intentionally attacked by another cellmate Autin, yet
the Seventh Circuit concluded that Gordon's "one surprise punch" and Autin's "wild swings"
did not give the prison guard "defendants reason to believe that [the plaintiff] faced an imminent
and substantial threat to his safety." *Owens*, 635 F.3d at 954.  Further, the Seventh Circuit found

that even if the guards "shrugged off the minor fisticuffs", "the evidence at summary judgment shows only that they misjudged the rifts between [the plaintiff] and the cellmates he bunked with amicably for a month." *Owens*, 635 F.3d at 954.

Here, there was not even any "minor fisticuffs" between Plaintiff and Tremain before the punch. Rather, the battery incident was unintentional. It was the result of Tremain losing his temper and smashing his cassette player into a wall, leading to the battery ricocheting and striking Plaintiff under the eye. Plaintiff himself admits repeatedly in his deposition that the incident was unintentional and an accident and that Tremain "didn't mean to do it." Because the injury healed quickly, Plaintiff never alerted prison staff or the guards as to what happened, except for the grievance to Defendant. Plaintiff was also unclear as to how much time elapsed between the two incidents, at one point saying a few weeks, but at another point in the deposition saying it could have been as little time as a few days.

Regardless, in light of *Owens*, the court cannot say that Defendant's failure to respond after the battery incident constituted deliberate indifference to a substantial risk of serious harm to Plaintiff. Unlike in *Owens*, where the plaintiff was assaulted by cellmates after guards ignored prior intentional physical attacks, Plaintiff was struck by Tremain's battery unintentionally after Tremain lost his temper and flung the cassette against the cell wall. Even if Defendant received the first emergency grievance and shrugged off the unintentional battery incident, the evidence at summary judgment shows only that Defendant misjudged the rift between Plaintiff and Tremain, who had bunked with each other without incident (if unamicably) for nearly a month. *See Owens*, 635 F.3d at 954. Nothing indicates that the risk to Plaintiff, after the unintentional battery incident, was more than minimal, and when Tremain did

deliberately strike Plaintiff, Tremain, according to Plaintiff, quickly removed himself from the cell *due to his fear of Plaintiff*.  Plaintiff also stated that he was not "afraid" of Tremain, but rather was afraid of what Tremain would do to his school program.  Under the facts adduced in discovery, Plaintiff cannot satisfy either prong of the failure to protect analysis, and thus cannot show a constitutional violation, and summary judgment must be entered in favor of Defendant.  Therefore, Defendant's Motion for Summary Judgment (#86) is GRANTED in full.  Because Plaintiff's Motion for Summary Judgment (#83) was simply a short summary of why Defendant was deliberately indifferent for failing to respond to his grievances (without any citation to case or supporting facts from the record), Plaintiff's motion is DENIED.  Defendant's Motion to Strike (#86) is MOOT.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#87) is GRANTED in full.  Judgment is entered in favor of Defendant and against Plaintiff.

(2) Plaintiff's Motion for Summary Judgment (#83) is DENIED.  Defendant's Motion to Strike (#86) is deemed MOOT.

(3) This case is terminated.

ENTERED this 22nd day of July, 2014.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE